Jessica **BALL**, Appellant

v.

Henrietta and Fred **TATUM**, Appellees.

No. 2011–CA–001716–ME.

Court of Appeals of Kentucky.

July 20, 2012.

Susan Montalvo–Gesser, Owensboro, KY, for appellant.

Albert W. Barber, III, Owensboro, KY, for appellee.

Before LAMBERT, NICKELL, and TAYLOR, Judges.

*OPINION*

NICKELL, Judge:

Jessica Ball appeals from an order entered by the Daviess Circuit Court designating her adoptive parents, Henrietta and Fred Tatum, *de facto* custodians of E.N.K.,[1] her special needs[2] daughter. The court awarded Ball and the Tatums joint custody of the four-year-old child, who neither walks nor talks, and named the Tatums primary residential custodians. Ball maintains the Tatums did not qualify as *de facto* custodians because they had not been the child's *exclusive* caregivers and financial supporters for one year as required by KRS[3] 403.270. Having reviewed the record, the law and the briefs, we affirm.

Ball is the adopted adult daughter of the Tatums. The Tatums are also Ball's biological grandparents. Ball has two daughters, E.N.K., born June 12, 2006, and L.B., born two years later. This appeal concerns only the custody of E.N.K. There is no allegation that Ball is an unfit mother,[4] nor that she waived her superior right to her daughter's custody.

In November 2010, E.N.K. suffered a seizure while with Ball. Fearing the seizure was caused by Ball not administering E.N.K.'s medication as prescribed, the Tatums petitioned the court to name them *de facto* custodians of their granddaughter and place the child in their care. After holding a hearing on the Tatum's motion for temporary custody, the trial court granted the motion and entered an order stating in part:

[t]he child has cerebral palsy and requires medication to control epileptic seizures as well as special attention on virtually everything. This child has extraordinary needs and the court is concerned that they are not currently being met while the child is in the custody of [Ball]. The court bases this conclusion on the testimony of Dr. Conrad [de Jesus], of several missed doctor appointments when the child is in the mother's custody. The court believes that everything possible is not being done to appropriately care for the child's needs.

The court reserved ruling on the issue of whether the Tatums qualified as *de facto* custodians and directed the commissioner to fully review the case, hold a hearing, and make a recommendation. From the bench, the court stated Ball would have unlimited visitation with the child; noted that Ball could not possibly raise the child alone; encouraged both parties to cooperate; and directed the Tatums to administer the child's medication.

Hearings held by the court and the commissioner showed that Ball's life has been marked by instability. Since E.N.K.'s birth, she has lived in ten locations, including with the Tatums multiple times. Once, in 2008, Ball left E.N.K. with the Tatums for a couple of months and moved in with her new husband—Ball visited with E.N.K. on the weekends.

1. Pursuant to Court policy, children in such cases are referred to by initials only to protect their identity.

2. The child was born premature. She suffers from cerebral palsy, epileptic seizures and mild asthma.

3. Kentucky Revised Statutes.

4. Ball discusses the standard for finding a parent to be unfit. We deem this superfluous because the trial court specifically found Ball was not an unfit mother and granted her joint custody and unlimited visitation.

Ball's two children have different fathers and she is currently expecting her third child by yet another man. She has worked off and on, but at nothing well-paying or long-term. She yells and curses at E.N.K. She smokes in the child's presence even though doctors have warned her that smoke aggravates her daughter's medical condition. She has missed many of the child's thrice weekly physical therapy appointments even though she has been advised that consistent therapy is essential to the child's progress and ability to walk. Some of those appointments were missed because Ball had stayed up late watching movies and did not feel like getting up. On other occasions, Ball would say she drank too much the night before and still exhibited slurred speech at 3:00 in the afternoon.

Though investigated for dependency, neglect or abuse three times, no reports against Ball were ever substantiated. Ball admitted she had received financial assistance from the Tatums in the preceding four years, and had occasionally lived in their home, but claimed she had continuously lived with her child, had held several jobs since the child's birth, had received monthly child support from the child's father,[5] and had arranged for E.N.K. to receive supplemental social security income and a state medical card—all of which contributed significantly to the child's financial support. Ball also testified that she had provided the bulk of her daughter's care by clothing and feeding her, waking her each morning and putting her to bed each evening; tending to her hygiene; and taking her to weekly therapy sessions. It was established that Ball

squandered $6,000.00 in back social security benefits that had been paid to the child. At the time of the hearings, E.N.K. was receiving $570.00 in monthly social security benefits, but Fred testified that Ball did not share any of that money with the Tatums to provide for E.N.K.'s needs.

In contrast, the Tatums are retired, have been married 46 years, have lived in Kentucky since 1982, and have lived in their current home for eleven years. In addition to providing cars to Ball and a rent-free place for her and her children to live for long stretches, the Tatums have also provided food (including Thick-It[6] formula), clothing and diapers to E.N.K.; taken E.N.K. to 95% of her physical therapy appointments; and administered E.N.K.'s anti-seizure medication 95% of the time. Fred testified that Ball and E.N.K. had lived in the Tatum's home from late July/early August 2007 until July/early August 2008; from late January 2009 until late April/early May 2009; and again, from late 2009 until April/May 2010, for a total of sixteen months—a fact with which Ball agreed. Fred also explained that in the summer of 2010, Henrietta was substituted as the payee of E.N.K.'s social security benefits, with Ball's consent, due to a second misappropriation of funds. According to Fred, from E.N.K.'s birth in 2006 until the summer of 2010, the Tatums were their granddaughter's primary caregivers and financial supporters.

On May 26, 2011, the commissioner entered his recommendation. In determining the Tatums qualified as *de facto* custodians under KRS 403.270, the com-

---

5. The identity of E.N.K.'s father is known to Ball but there has been no adjudication of paternity, no court has ordered him to pay child support, and he has not been made a party to these proceedings. Any payments made were voluntary and could cease at any time. At the time of the final hearing before the commissioner, Ball was uncertain if child support was being paid.

6. Thick-It is a food thickener for swallowing problems.

missioner noted that Ball and E.N.K. had lived with the Tatums from late July, 2007 until late July/early August, 2008, and during that year, the Tatums had:

> provided ninety-five (95%) percent of the child's financial needs by providing shelter, food and clothing for the child. [Ball] contributed very little, if anything, toward those needs. During that period, [Ball] worked for a short period of time at a couple of jobs, but managed to get fired for various reasons. After this period of time, the child was awarded some form of Social Security Disability that amounted to $500.00 a month. She also received approximately $6,000.00 in back benefits. This amount was paid to [Ball], as mother of the child. [Ball], at that point, moved out of the [Tatum's home] and in to (sic) a residence with Robert Ball. Thereafter, she married Mr. Ball and had a second child, [L.B.]. That relationship was off and on for a period and while the relationship was on, the two of them managed to exhaust the $6,000.00 back benefits that belonged to the child. During the first one year period that [Ball] and the child resided with the [Tatums], the evidence supports a finding that the [Tatums] were the primary caregivers of the child. They made sure the child received her daily medications; they took the child to her therapy sessions and primarily provided the daily care that the child requires because of her special needs. Based on the foregoing findings, the [Tatums] have met the criteria of *de facto* custodians.

7. Ball confirmed the Tatums timeline on cross-examination during the hearing before the commissioner on April 19, 2011.

8. The Tatums moved the court to alter, amend or vacate this part of its oral order upon being

The commissioner then recommended naming the Tatums as E.N.K.'s primary residential custodians and allowing Ball to have parenting time.

On July 12, 2011, the circuit court held a hearing on Ball's exceptions to the commissioner's report and recommendation. Ball argued E.N.K. had not lived with the Tatums for a year. The Tatums argued the proof showed the child had lived with them for sixteen months.[7] The court ruled from the bench that it was adopting the commissioner's recommendation in full; denying Ball's exceptions; and finding that Ball had failed to provide E.N.K.'s essential needs for reasons other than poverty. The court made it clear that E.N.K. needs assistance from **all** parties and applauded the commissioner for recommending joint custody. The court stated he was **not** finding Ball to be unfit, but rather that she was **not suitable to care for the child at the present time.** He further stated he fully anticipated returning E.N.K. to Ball once she had delivered the child she was carrying and her life had stabilized. The court was adamant that E.N.K. should be with Ball on the weekends. The court then discussed E.N.K.'s income and confirmed the child was receiving $570.00 in monthly social security benefits and had a medical card but did not receive food stamps. The court ordered the Tatums to pay one-half of E.N.K.'s social security benefits to Ball.[8]

On August 11, 2011, the circuit court entered an amended written order adopting the commissioner's recommendation and sustaining the Tatum's motion to alter, amend or vacate. The court made the following additional findings:

> advised by the social security office that sharing benefits with Ball, even pursuant to a court order, could jeopardize future payments.

1. [Ball] has failed or is unable to provide for the essential needs for this child for reasons other than poverty alone. This child has extraordinary special needs and will continue to need the assistance of all parties.

2. The Court finds that the parties should have joint custody of E.K., with the [Tatums] being designated as the primary residential care givers (sic) as [Ball] is not a suitable primary care giver (sic) at this time and the child's best interest (sic) are served by designating the [Tatums] as primary residential care givers (sic).

3. This child needs constant care 24 hours a day which would be impractible (sic) for [Ball] to provide given that she has another child that is two years old and will soon have a newborn.

4. [Ball] shall have liberal parenting time with E.K., including but not limited to each weekend which shall commence on Friday at the conclusion of E.K.'s therapy session through Sunday.

This appeal followed challenging whether the Tatums qualified as *de facto* custodians and, if they did, whether it was in their granddaughter's best interest to be placed in their joint custody with Ball.

## ANALYSIS

Ball raises several issues on appeal, the first being that the circuit court erroneously found the Tatums to be *de facto* custodians. KRS 403.270(1)(a) defines a *de facto* custodian as "a person who has been ... the primary caregiver for, and financial supporter of, a child who has resided with the person for a period ... of one (1) year or more if the child is three (3) years of age or older...." Importantly, the statute requires a person seeking to be named a *de facto* custodian to prove he is the child's *primary* caregiver and *primary* financial supporter—not that he is the child's sole, only or exclusive provider, as Ball contends. As expressed in *Com., Finance and Admin. Cabinet, Dept. of Revenue v. Saint Joseph Health System, Inc.,* —— S.W.3d ——, ——, 2011 WL 4633108 (Ky. App.2011),

[s]tatutes express the General Assembly's intent. *Gateway Const. Co. v. Wallbaum,* 356 S.W.2d 247, 248 (Ky. 1962). To determine its intent, we must examine the precise language used in the statute without reading into it words that are not there, *Bohannon v. City of Louisville,* 193 Ky. 276, 235 S.W. 750, 752 (1921), or guessing what the General Assembly might have intended to say but did not. *Lewis v. Creasey Corporation,* 198 Ky. 409, 248 S.W. 1046, 1048 (1923).

Were we to accept Ball's reading of KRS 403.270, we would be writing our own statute rather than reading the words specifically enacted by the legislature and that we cannot do. We must conclude the General Assembly chose the word "primary" to modify the terms "caregiver" and "financial supporter" for good reason. It certainly could have chosen the phrases, "only caregiver," "sole caregiver" or "exclusive caregiver," but it did not.

The dictionary defines the word "primary" as "first in order of time or development (and) of first rank, importance, or value...." *See Merriam–Webster Dictionary Online,* http://www.merriam-webster.com/dictionary (last viewed May 11, 2012). Synonyms for the word "primary" include chief, dominant, first, greatest, highest, main, paramount, predominant and principal—all words that invite a comparison between multiple entities rather than describing a single entity.

■ A custody determination is a mixed question of fact and law requiring a two-tier analysis. First, we review a trial court's factual findings, disturbing them

only if they are clearly erroneous—meaning they are unsupported by substantial evidence which is defined as that which is "sufficient to induce conviction in the mind of a reasonable person." *B.C. v. B.T.*, 182 S.W.3d 213, 219–20 (Ky.App.2005). Second, we examine the trial court's application of the law *de novo*. *See Heltsley v. Frogge*, 350 S.W.3d 807, 808 (Ky.App. 2011).

■ As outlined above, there was proof that Ball and E.N.K. lived with the Tatums rent-free from late July/early August 2007 through July/early August 2008. Thus, the one-year period was satisfied. Fred further testified that during this time the Tatums provided 95% of E.N.K.'s financial support by buying diapers, baby food and clothes. They also took E.N.K. to her physical therapy appointments 95% of the time and Henrietta gave E.N.K. her medication. Ball held a few jobs during this time, but nothing long-term or well-paying. The Tatums did not request from Ball, nor did they receive, reimbursement for any of their expenses related to E.N.K. Fred acknowledged that Ball arranged for E.N.K. to receive $570.00 in monthly social security benefits, but none of that money was given to the Tatums. Dr. de Jesus testified that regular physical therapy was critical, but Ball missed many therapy appointments while the Tatums consistently brought E.N.K. and always called when the child would miss a session due to illness.

■ These facts clearly and convincingly establish the Tatums were E.N.K.'s primary caregivers and primary financial providers for one year at a minimum. The fact that Ball also cared for E.N.K. on occasion does not negate the Tatums standing to petition for custody because "exclusive care and exclusive supervision" of the child is not required. *Mullins v.*

*Picklesimer*, 317 S.W.3d 569, 574 (Ky. 2010). Therefore, the trial court's findings, and its designation of the Tatums as *de facto* custodians, was not clear error and will not be disturbed. CR [9] 52.01.

Citing *Consalvi v. Cawood*, 63 S.W.3d 195 (Ky.App.2001), *abrogated on other grounds by Moore v. Asente*, 110 S.W.3d 336 (Ky.2003), Ball argues the Tatums could not satisfy KRS 403.270 because they cared for E.N.K. in tandem with Ball, not to her exclusion. In *Consalvi*, a man was found to be "a" primary caregiver for two children rather than "the" primary caregiver for them. This was deemed inadequate for *de facto* custodian status because KRS 403.270 does not "intend that multiple persons be primary caregivers." This case is not marked by a similar flaw because the commissioner found the Tatums to be "the primary caregivers for the child" and the court adopted the commissioner's recommendation in full. Thus, we deem *Consalvi* distinguishable from the facts at hand.

Furthermore, taken as a whole, it appears Ball's parenting role was minimal at best—she knew she did not have to personally care for her daughter because Henrietta would make certain E.N.K. received her medication on time, attended therapy and had food to eat. Moreover, for reasons explained above, we do not read *Consalvi* to require that a person seeking to be named a *de facto* custodian care for or provide for a child to the exclusion of all others. For all practical purposes, the Tatums had assumed the role of parents and stood in Ball's place because the evidence established they were caring for and providing for E.N.K. while Ball was partying.

Ball also argues the Tatums could not have been E.N.K.'s primary financial sup-

porters because the child received social security benefits, food stamps, child support and had a medical card. We disagree. While there was proof that Ball had other sources of funds available to her, there was no proof that funds Ball received from any of those sources were used for E.N.K.'s actual benefit. Even if outside funds had reached E.N.K., there is no indication they would have provided all of the child's needs. Moreover, we know that Ball diverted at least $6,000.00 in social security benefits that were intended for the child. There was no evidence comparing the amount of money available from outside sources, the amount of money spent by the Tatums, and the amount of money needed to rear a special needs child. There was testimony that Ball arranged for E.N.K. to receive social security benefits of about $500.00 a month, but this was only *after* the Tatums had already provided 95% of the child's financial support for a year. Based on the evidence elicited, the most we can say is the income received from sources other than the Tatums was supplemental. This result is consistent with *Williams v. Bittel*, 299 S.W.3d 284, 289 (Ky.App.2009), wherein a child's mother and her boyfriend intermingled funds for the first eighteen months of a child's life. When the mother died, the boyfriend was deemed to qualify for *de facto* custodian status even though he had never been the child's "sole source of financial support." Thus, on the strength of *Williams*, we are confident the Tatums were E.N.K.'s primary financial supporters, as well as her primary caregivers, and therefore qualified for designation as her *de facto* custodians.

■ While Ball's testimony painted a different picture, there was sufficient evidence from which the court could, and did, find the Tatums satisfied the statutory requirements and declared them to be *de facto* custodians. As the fact-finder, the court had sole discretion to determine the quality, character, and substance of the evidence, *see Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky.1985), and the sole duty to judge the credibility of the witnesses. *See Ghali v. Ghali*, 596 S.W.2d 31, 32 (Ky.App.1980). It was its responsibility alone to believe or disbelieve the testimony. *Id.* Just because Ball's version of events contradicted Fred's version does not mean the trial court erred in relying upon Fred's testimony. Furthermore, when the testimony before the trial court is conflicting, we will not substitute our decision for the trial court's judgment. *R.C.R. v. Commonwealth, Cabinet for Human Resources*, 988 S.W.2d 36 (Ky.App. 1998).

■ We turn now to the question of whether placing E.N.K. in the joint custody of Ball and the Tatums was in the child's best interest. KRS 403.270(2). Trial courts are vested with broad discretion in matters concerning custody. *Futrell v. Futrell*, 346 S.W.2d 39 (Ky.1961); *Drury v. Drury*, 32 S.W.3d 521, 525 (Ky. App.2000). Absent an abuse of discretion, we will not disturb a trial court's decision. *Young v. Holmes*, 295 S.W.3d 144, 146 (Ky.App.2009). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999) (citation omitted); *see also Kuprion v. Fitzgerald*, 888 S.W.2d 679, 684 (Ky.1994). The test is not whether we as an appellate court would have decided the matter differently, but whether the trial court's rulings were clearly erroneous or constituted an abuse of discretion. *Cherry v. Cherry*, 634 S.W.2d 423, 425 (Ky.1982).

■ Determining custody is not an easy matter. KRS 403.270 requires a trial

court to evaluate all relevant factors when deciding custody. *Jones v. Jones*, 577 S.W.2d 43, 45 (Ky.App.1979). Here, the trial court was clearly concerned with preserving and nurturing the bond between Ball and her daughter as evidenced by his insistence that the two spend weekends together and granting liberal visitation to Ball so that she could have the child as often as she desired. The court also stated its intention to reunite Ball with E.N.K. as soon as Ball had delivered her third child and her life had stabilized. At the same time, the court recognized the important role the Tatums had played, and would continue to play, in providing for their granddaughter's extraordinary needs. We are persuaded the court considered all the relevant factors and discern no clear error or abuse of discretion in its decision to award joint custody to Ball and the Tatums.

For the foregoing reasons, the amended order of the Daviess Circuit Court entered on August 11, 2011, is AFFIRMED.

ALL CONCUR.