RENDERED: JUNE 7, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0786-MR

ELIZABETH SHELTON                                             APPELLANT

v.          APPEAL FROM MCCRACKEN FAMILY COURT
HONORABLE DEANNA WISE HENSCHEL, JUDGE
ACTION NO. 22-CI-00177

KAYLA STARNES AND
TIMOTHY KEITH                                               APPELLEES

OPINION
REVERSING

** ** ** ** **

BEFORE: ECKERLE, KAREM, AND LAMBERT, JUDGES.

KAREM, JUDGE: Elizabeth Shelton appeals from a McCracken Family Court

order denying her petition seeking *de facto* custodian status and custody of Kayla

Starnes's minor child. Upon careful review, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

Shelton and Starnes were best friends in high school and maintained a close relationship thereafter. Shelton was present at the birth of Starnes's son, P.K. ("Child") in 2016. Child's natural father, Timothy Keith, was not involved in Child's upbringing. In 2019, Shelton provided babysitting for Child, every other week or less. In March 2020, she began to look after him weekly from Friday night through Monday afternoon. In 2021, these periods increased in length to four to five days per week. Shelton provided food, clothing, and personal care for Child during these periods, and he always had a room at her home. Shelton received no financial support from Starnes and Starnes generally did not have contact with Child while he was in Shelton's care.

In May 2021, Shelton traveled with Child to Arkansas for three to four days to visit her father, and in July 2021 she took Child to Cave City to celebrate his birthday. Starnes did not accompany them on these trips. Shelton also enrolled Child in rodeo activities.

In October 2021, Child injured his foot on a samurai sword at his mother's house. Starnes took him to school the next day, but the school later telephoned for him to be picked up because the injury appeared serious. Shelton picked him up and that evening took him to the emergency room, where he required four stitches. His mother did not go to the emergency room. Shelton also

went with Child to the orthopedic center where it was determined that he needed surgery and she attended most of his appointments. Starnes was present for the surgery and cast removal but did not go with Child to physiotherapy. Shelton and Starnes went together to sign Child up for kindergarten and Shelton scheduled Child's back-to-school appointments. Shelton also attended his parent-teacher conferences with Starnes.

The friendly relationship between Shelton and Starnes ceased at the end of 2021, after Shelton opposed Starnes's decision to start homeschooling Child. Starnes stopped allowing Shelton to see Child and ultimately Shelton filed a petition for *de facto* custodian status and custody on March 9, 2022.

The family court held an evidentiary hearing at which it heard testimony from Shelton and Starnes, from Shelton's best friend, from Shelton's mother, and from Starnes's boyfriend. Child's natural father did not attend or participate in any way, but he filed an entry of appearance and waiver, stating he did not dispute the statistical information in Shelton's petition.

Shelton's best friend testified that Shelton had looked after Child four to six days per week, and she had witnessed no interaction with Mother at these times. Shelton's mother testified that Child was like her grandson, that Shelton had been a constant in his life, and that Starnes provided no financial support to Shelton. Starnes's fiancé testified that he and Starnes currently reside with his

mother and Child. Starnes has another child who resides primarily with his father. Starnes sees her other son every other weekend.

Starnes testified that she was unable to attend some of Child's medical appointments because she was at work. The family court questioned her about weekends when she was not working yet left the Child with Shelton. She explained that she wanted to spend time with her then-boyfriend, but that he was abusive, and she wanted to keep him away from Child. She testified that she stopped contact with Shelton because Child was calling Shelton "Mom." She testified that she never paid Shelton to care for Child because Shelton had never asked for money.

The family court found that during the three years preceding the hearing, Shelton had moved from being a part-time caregiver to being a primary caregiver and financial supporter. The family court recognized that Shelton vacationed with Child, threw birthday parties for him, celebrated holidays with him, and enrolled him in extracurricular activities. Nonetheless, the family court determined that even though Shelton provided very generous contributions of childcare and financial support, Starnes remained substantially and consistently involved with Child's life and did not cede or abdicate her unique parental decision-making authority to Shelton. The family court noted, for instance, that Starnes had to be present in order for Shelton to attend school conferences because

Starnes refused to give her authority to attend alone. The family court ruled that under our case law, which holds that even generous contributions of childcare and financial support from a nonparent do not always confer *de facto* custodian status, Shelton did not qualify as a *de facto* custodian and denied her motion. This appeal by Shelton followed.

## PRELIMINARY ISSUE

We first note that neither Starnes nor Keith filed an appellee brief. As stated in Kentucky Rule of Appellate Procedure ("RAP") 31(H)(3): if the appellee's brief has not been filed within the time allowed, the court may (i) accept the appellant's statement of the facts and issues as correct; (ii) reverse the judgment if the appellant's brief reasonably appears to sustain such action; or (iii) regard the appellee's failure as a confession of error and reverse the judgment without considering the merits of the case. "The decision as to how to proceed in imposing such penalties is a matter committed to our discretion. *Kupper v. Kentucky Bd. of Pharmacy*, 666 S.W.2d 729, 730 (Ky. 1983); *Flag Drilling Co., Inc. v. Erco, Inc.*, 156 S.W.3d 762, 766 (Ky. App. 2005)." *Roberts v. Bucci*, 218 S.W.3d 395, 396 (Ky. App. 2007). In the case *sub judice*, we choose to accept the appellant's statement of facts and issues as correct.

## STANDARD OF REVIEW

"A custody determination is a mixed question of fact and law requiring a two-tier analysis." *Ball v. Tatum*, 373 S.W.3d 458, 463 (Ky. App. 2012). "First, we review a trial court's factual findings, disturbing them only if they are clearly erroneous – meaning they are unsupported by substantial evidence which is defined as that which is sufficient to induce conviction in the mind of a reasonable person." *Id*. at 463-64 (internal quotation marks and citation omitted). "Second, we examine the trial court's application of the law *de novo*." *Id.* at 464.

## THE STATUTORY FRAMEWORK

To be placed on the same legal footing as a natural parent in child custody proceedings, a person must qualify as a "*de facto* custodian," which is defined in Kentucky Revised Statutes (KRS) 403.270(1) as:

> [A] person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who within the last two (2) years has resided with the person for an aggregate period of six (6) months or more if the child is under three (3) years of age and for an aggregate period of one (1) year or more if the child is three (3) years of age or older or has been placed by the Department for Community Based Services. Any period of time after a legal proceeding has been commenced by a parent seeking to regain custody of the child shall not be included in determining whether the child has resided with the person for the required minimum period.

KRS 403.270(1)(a).

-6-

Once a court "determines by clear and convincing evidence that the person meets the definition of *de facto* custodian . . . the court shall give the person the same standing in custody matters that is given to each parent under this section[.]" KRS 403.270(1)(b).

The standard to achieve *de facto* custodian status is very high, because "[t]he courts of this Commonwealth have consistently recognized the superior right of natural parents to the care, custody, and control of their children as well as the constitutionally protected right of a parent to raise his or her own child." *Brumfield v. Stinson*, 368 S.W.3d 116, 118 (Ky. App. 2012). Therefore, "[b]efore the family court may find that a caregiver has become the '*de facto* custodian' . . . the court must determine that the biological parent has abdicated the role of primary caregiver and financial supporter of the child for the required period of time." *Id*. (citations omitted). "[O]ne must literally stand in the place of the natural parent to qualify as a *de facto* custodian." *Id*. (internal quotation marks and citation omitted).

## ANALYSIS

We agree with the court's assessment of the nature of Shelton's relationship with Child as it relates to the time requirements set out in KRS 403.270(1)(a). Clearly, Shelton was the primary caregiver and supporter of Child for an aggregate period of one year or more. Curiously, Shelton does not dispute

the family court's finding that she co-parented with Starnes but argues she should not be prevented from being a *de facto* custodian solely on that basis. Specifically, she contends that a recent amendment of KRS 403.270(1) supports a different approach to evaluating *de facto* custodial status.

Prior to the amendment, which became effective in 2021, KRS 403.270(1)(a) defined a *de facto* custodian in pertinent part as "a person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who has resided with the person for a period of six (6) months or more if the child is under three (3) years of age and for a period of one (1) year or more if the child is three (3) years of age or older[.]" In *Meinders v. Middleton*, 572 S.W.3d 52 (Ky. 2019), the Kentucky Supreme Court construed that version of the statute to mean that "the period of time required to qualify for *de facto* custodian status under KRS 403.270 must be one continuous period of time[,]" rejecting the appellant's argument that individual periods of caregiving could be aggregated to achieve the total. *Meinders*, 572 S.W.3d at 57. Then Chief Justice Minton, joined by Justice VanMeter, wrote an opinion concurring in result only, stating in part as follows:

> I am unconvinced by the majority's assertion that "allow[ing] a claimant to aggregate periods of time would undermine the purpose of the statute" because "allow[ing] a third party to aggregate periods of time to add up to six months . . . would drastically lower the burden of proof" for those seeking *de facto* custodian

-8-

status and infringe on a parent's constitutional right to raise his or her own child. At bottom, there is no difference between a child residing with another individual for a *total or* continuous period of six months before the child even turns three – in both situations the child has resided with another individual for six months.

In fact, I would argue that the majority's interpretation undermines the statute because it actually creates an absurd result. Under the majority's interpretation, a deadbeat parent who has dumped his or her two-year-old child off on a loving caregiver could show up once every five months to comply with parental duties for a week, only to return the child in the care of that caregiver for another five months, thus preventing the loving caregiver from attaining *de facto* custodian status to seek, on equal footing with the parent, custody of the child. It would seem absurd to think that in that scenario, where the child has technically resided with that caregiver for almost the entirety of his or her life, the General Assembly would not have intended to bestow *de facto* custodian status on that loving caregiver, yet bestow *de facto* custodian status on an individual who has had a child reside with him or her for one, continuous period of six months that is actually less than half the amount of time the child resided with the previously-mentioned caregiver.

*Id*. at 63-64 (Minton, C.J., concurring in result only) (footnote omitted).

As further support for this view, the Chief Justice cited an opinion of the Indiana Court of Appeals which interpreted a virtually identical Indiana statute to allow for "the combining of time periods to satisfy the residency prong." *Id*. at 63 (citing *A.J.L. v. D.A.L.*, 912 N.E.2d 866, 870-71 (Ind. Ct. App. 2009)).

The Kentucky statute was subsequently amended to permit the aggregation of periods of time.

Shelton argues that she met her burden of proof because the aggregated periods of her weekly caregiving amount to more than one year, in compliance with the amended statute, and that the family court's ruling goes against the spirit of the amended law. She contends that preventing a party from establishing *de facto* custodian status solely due to the existence of co-parenting activity prevents non-parents from engaging in potentially beneficial communication with biological parents and creates a situation where non-parents have no legal recourse. She cautions that affirming the family court's decision would allow parents who have acquiesced in allowing their children to be raised by a non-parent for most of the time to retain the unilateral authority to end the non-parents' relationship with the children. While her arguments are compelling, we need not stray beyond the basic review of the facts to the applicable law to make our determination that Shelton is entitled to the status of *de facto* custodian.

The family court did not dispute that the periods Child spent in Shelton's care could be aggregated to a total of one year as required under KRS 403.270(1) and we agree. However, in order to be a *de facto* custodian, the nonparent must not simply be *a* primary caregiver, but must, in fact, be *the* primary caregiver. "Thus, our law is clear that even if a nonparent provides care and/or

-10-

financial support for a child, if such is in conjunction with a natural parent, the nonparent will not qualify as a *de facto* custodian." *Burgess v. Chase*, 629 S.W.3d 826, 833 (Ky. App. 2021) (citing *Consalvi v. Cawood*, 63 S.W.3d 195, 197-98 (Ky. App. 2001) and *Boone v. Ballinger*, 228 S.W.3d 1 (Ky. App. 2007)). In the case at bar, the court erroneously concluded that Starnes had not relinquished complete control of Child to Shelton when Child was in her care although the facts clearly support such a conclusion.

The court recognized Shelton was not only primary caretaker but a financial supporter as well. She vacationed with Child, threw birthday parties for Child, celebrated holidays with him, and sought emergency medical treatment and follow-up care for Child when Starnes arguably ignored his serious injury. Notably, Starnes chose to spend weekends with a boyfriend, whom she acknowledged was abusive, rather than spend time with Child. We do not take exception to the court's findings of facts. However, the court misapplied these facts to the law; and we conclude that Starnes *did* in fact relinquish her superior rights to Shelton thus providing the basis for Shelton to be declared *de facto* custodian.

Therefore, the family court's decision that Shelton was precluded from achieving *de facto* custodial status because Starnes had not abdicated control

-11-

over critical aspects of the Child's life is set aside.  The case is remanded back to the family court for findings consistent with this Opinion.

## <u>CONCLUSION</u>

For the foregoing reasons, the family court's order denying Shelton's petition is reversed.


ALL CONCUR.


BRIEF FOR APPELLANT:                    NO BRIEF FOR APPELLEES.

Caleb M. Nelson
Paducah, Kentucky