RENDERED:  DECEMBER 19, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0964-MR

RACHEL SUTTON                                       APPELLANT


              APPEAL FROM GRAYSON CIRCUIT COURT
v.             HONORABLE KENNETH H. GOFF, II, JUDGE
                  CASE NO. 23-CI-00203


VEGAS HIGDON; ASHLEY
HIGDON; AND DYLAN
HIGDON                                         APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CETRULO, KAREM, AND MOYNAHAN, JUDGES.

KAREM, JUDGE:  Rachel Sutton appeals from the Grayson Circuit Court's amended findings of fact, conclusions of law, and judgment regarding the custody of her minor child.  The circuit court found that the child's paternal grandfather and his wife qualify as de facto custodians.  It awarded them joint custody and the majority of parenting time.  Upon careful review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Rachel Sutton ("Rachel") gave birth to E.H. ("Child") in May 2022. She and Child's biological father, Dylan Higdon ("Dylan"), are not married. Dylan's father, Vegas Higdon, is married to Ashley, who is Dylan's stepmother ("the Higdons").

Although the recording of the district court proceedings is not in the record before us, the parties do not dispute that a dependency, neglect, and abuse ("DNA") action regarding Child was filed against Rachel in Breckenridge District Court in July 2022. The primary reason for the action was Rachel's alcohol dependency and abuse. Child was removed from the home and placed in Dylan's custody. A DNA action was subsequently filed against Dylan for drug dependency and abuse, and the district court ordered Child to be placed in the temporary custody of the Higdons.

Child resided with the Higdons for approximately eighteen months, from July 2022 until December 15, 2023. During this period, Rachel was working on a case plan prepared for her by the Cabinet for Health and Family Services. About five months after Child was placed in the Higdons' custody, Rachel began to file successive motions in district court for a return of custody of Child, all of which were denied: (1) motion filed on November 22, 2022, denied on November 28, 2022; (2) motion filed on February 28, 2023, denied on March 6, 2023; (3)

motion filed on March 14, 2023, denied on March 20, 2023; (4) motion filed on May 1, 2023, denied on May 8, 2023; and (5) motion filed on September 12, 2023, denied on October 9, 2023. Following a scheduled review, the district court entered an order on December 8, 2023, returning custody to Rachel and Dylan effective on December 15, 2023.

Meanwhile, on January 23, 2023, prior to Rachel's second motion for custody of Child filed in February, the Higdons filed a petition seeking de facto custodian status and primary residential custody of Child. The petition was ultimately dismissed by agreed order.[1]

On September 21, 2023, the Higdons filed another petition for custody of Child or, in the alternative, for grandparent visitation. Following a hearing, the Domestic Relations Commissioner ("DRC") found that the Higdons qualified as de facto custodians under Kentucky Revised Statutes ("KRS") 403.270(1)(a), and recommended the circuit court grant them this status. On April 3, 2024, the circuit court entered an order adopting the DRC's findings of fact, conclusions of law, and order.

The DRC thereafter conducted a hearing to determine custody and parenting time and issued recommendations on May 10, 2024. Rachel and Dylan

---

[1] Rachel claims that the agreed order dismissed the petition with prejudice whereas the Higdons assert it was without prejudice. Rachel did not raise this as grounds for opposing the Higdons' second petition for custody and consequently the issue was waived.

filed exceptions.  Following a hearing on the exceptions, the circuit court entered findings of fact, conclusions of law, and judgment in accordance with the DRC's recommendations.  It awarded joint custody of Child to Rachel and Dylan and to the Higdons.  Child was to reside primarily with the Higdons; Rachel and Dylan were awarded parenting time every other weekend and every Tuesday from 6 pm until Wednesday at 8:15 am.  Rachel filed a Kentucky Rules of Civil Procedure ("CR") 59.05 motion to alter, amend, or vacate.  She also filed a notice of appeal before the circuit court had ruled on the motion to alter, amend, or vacate.  This Court ordered the appeal held in abeyance until the circuit court ruled on the post-judgment motion.  On September 9, 2024, the circuit court entered amended findings of fact, conclusions of law, and judgment.  This Court returned the appeal to the active docket.

## STANDARD OF REVIEW

"A custody determination is a mixed question of fact and law requiring a two-tier analysis."  *Ball v. Tatum*, 373 S.W.3d 458, 463 (Ky. App. 2012).  "First, we review a trial court's factual findings, disturbing them only if they are clearly erroneous – meaning they are unsupported by substantial evidence which is defined as that which is sufficient to induce conviction in the mind of a reasonable person."  *Id.* at 463-64 (internal quotation marks and citation omitted).  "Second, we examine the trial court's application of the law *de novo*."  *Id.* at 464.

## ANALYSIS

Rachel argues that the circuit court erred; (i) in awarding the Higdons de facto custodian status; (ii) in failing to give sufficient weight to evidence that was favorable to her; (iii) in adopting the Higdons' tendered judgment; (iv) in holding that the presumption of equal parenting time was overcome; and (v) in not maximizing her parenting schedule to afford her more time with Child.

**(i) The circuit court did not err in holding that the Higdons met the definition of de facto custodians**

A de facto custodian is defined as:

[A] person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who within the last two (2) years has resided with the person for an aggregate period of six (6) months or more if the child is under three (3) years of age and for an aggregate period of one (1) year or more if the child is three (3) years of age or older or has been placed by the Department for Community Based Services. Any period of time after a legal proceeding has been commenced by a parent seeking to regain custody of the child shall not be included in determining whether the child has resided with the person for the required minimum period.

KRS 403.270(1)(a).

Once a court "determines by clear and convincing evidence that the person meets the definition of de facto custodian . . . the court shall give the person the same standing in custody matters that is given to each parent under this section[.]" KRS 403.270(1)(b).

The standard to achieve de facto custodian status is very high, because "[t]he courts of this Commonwealth have consistently recognized the superior right of natural parents to the care, custody, and control of their children as well as the constitutionally protected right of a parent to raise his or her own child." *Brumfield v. Stinson*, 368 S.W.3d 116, 118 (Ky. App. 2012). Therefore, "[b]efore the family court may find that a caregiver has become the 'de facto custodian' entitled to be placed on the same footing as a biological parent in a custody proceeding, the court must determine that the biological parent has abdicated the role of primary caregiver and financial supporter of the child for the required period of time." *Id.* (citations omitted).

The circuit court entered its ruling on the Higdons' de facto custodian status on April 3, 2024. Our case law provides that, generally, an order granting a nonparent de facto custodian status is interlocutory and should be reviewed on appeal after the entry of the final judgment determining custody, which is what occurred in this case. *See Cherry v. Carroll*, 507 S.W.3d 23, 27 (Ky. App. 2016).

The circuit court found that Child resided with the Higdons from July 2022, when she was approximately 3.5 months old, until 15 December 2023, for a total of eighteen months.

The court acknowledged that Rachel filed numerous motions for return of custody while Child was residing with the Higdons. It calculated that

"[a]dding up all the dates where [Rachel] had initiated a return of custody until the Court disposed of those motions totaled sixty days. Even giv[ing] [Rachel] credit for the time she tolled the time, [the Higdons] are still aggregately exceeding the six month time threshold for de facto custodian status."

Rachel argues that the period for calculating de facto custodianship should have stopped when she filed her first motion for return of custody in November 2022, five months after Child was placed in the temporary custody of the Higdons by the district court. She contends that this approach is in accordance with the tolling provision in the statute, which states that "[a]ny period of time after a legal proceeding has been commenced by a parent seeking to regain custody of the child shall not be included in determining whether the child has resided with the person for the required minimum period." She claims the court ignored her repeated, ongoing attempts to regain custody and her answers and counterclaims to the Higdons' petitions for de facto custodian status. She relies on *Heltsley v. Frogge*, 350 S.W.3d 807 (Ky. App. 2011), which held that the ongoing efforts by a father to regain custody of his child from grandparents were sufficient to toll the statutory period.

But *Helstley* was decided before KRS 403.270 was amended in 2021. The statutory amendment specifically allows the aggregation of periods of residency for purposes attaining de facto custodian status. Before 2021, the statute

-7-

defined de facto custodian in pertinent part as "a person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who has resided with the person for a period of six (6) months or more if the child is under (3) years of age[.]" The definition now states: "a person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who within the last two (2) years has resided with the person for **an aggregate** period of six (6) months or more if the child is under three (3) years of age[.]" (Emphasis supplied.) The amendment demonstrates a clear intent on the part of the legislature to allow aggregation of periods of residency.

Rachel does not dispute that she provided no financial support, food, or clothing for Child for the approximately eighteen months Child was in the Higdons' care. If we subtract the periods during that time that she sought a return of custody, the aggregate time remaining still exceeds the six-month time specified by the statute for attaining de facto custodian status. As a matter of law, the circuit court did not err in ruling that the Higdons qualified as de facto custodians of Child.

**ii. The circuit court's findings of fact are not clearly erroneous**

Rachel argues that the circuit court failed to give sufficient weight to the evidence in her favor in determining custody. She claims it ignored her

continuous efforts to regain custody, the fact that she did ultimately regain custody in December 2023, and the fact Child continued to be in her sole custody until May 2024. She contends that the circuit court also failed to discuss her close bond and relationship with Child, as described by a social worker and by Rachel's mother. Additionally, she claims the court failed to address the fact that she is the mother of two other children of whom she has custody, and that it would be beneficial for Child to reside with her half-siblings.

KRS 403.270 requires the court to determine custody in accordance with the best interests of the child, giving equal consideration to each parent and to any de facto custodian. KRS 403.270(2). The court is directed "to consider all relevant factors and provides a list of non-exclusive, demonstrative factors to be considered in custodial determinations." *Frances v. Frances*, 266 S.W.3d 754, 756 (Ky. 2008).

Under KRS 403.270(2)(a), which requires the court to consider the "wishes of the child's parent or parents, and any de facto custodian, as to his or her custody[,]" the circuit court acknowledged that Rachel, Dylan, and the Higdons all wished to be Child's primary caregivers. It found that Child had lived with the Higdons for most of her life and that even after she was placed back in Rachel's custody, she continued to stay at least half the time with the Higdons. The court

noted that Rachel and Dylan allowed this to continue until they thought it would be used against them in court.

Under KRS 403.270(2)(c), which requires the court to consider the "interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may significantly affect the child's best interests[,]" the court described Child's interaction with the Higdons as "good[,]" referring to numerous photos of Child appearing well taken care of, happy and healthy while in their care. The court also found Child has bonded with her half-sibling, who resides with his father and visits Rachel and Dylan every other weekend and one day overnight per week. The court found that this relationship has been facilitated by the half-sibling's grandmother.

Under KRS 403.270(2)(d), which requires the court to consider "the motivation of the adults participating in the custody proceedings[,]" the court found that the Higdons had acted as the primary residential parents and sole caregivers for Child for the majority of her life. It further found that, although Rachel and Dylan historically had difficulty prioritizing Child's needs before their own, they did appear to have a sincere desire for custody.

Under KRS 403.270(2)(e), which requires the court to assess the child's "adjustment and continuing proximity to . . . home, school and community[,]" the court found that Child was well-adjusted to the Higdons' home

and was likely comfortable in Rachel's home was well. Child is too young to participate in school or community activities.

Under KRS 403.270(2)(f), which requires an assessment of "the mental and physical health of all individuals involved[,]" the court found that the physical and mental health of the Higdons was not an issue. It noted that Rachel admitted to alcohol abuse and Dylan to illegal drug abuse and acknowledged that they have both sought treatment and had negative drug screens except for prescription medication. The court's concerns focused on Rachel's attitude toward Child's health care. Rachel testified that Child is allergic to dust mites, but later admitted Child has never been tested for allergies. Rachel also testified that she took Child to a well-child visit in March 2024, but this was the only medical visit with Child she has attended since Child's removal in 2022. Ashley Higdon testified she was concerned that Child's medication was not being picked up from the pharmacy in a timely manner and that there was too much medication left over when Child returned from Rachel and Dylan's home, indicating she might not be properly medicated according to her prescriptions. The court noted that these statements were uncontroverted.

Under KRS 403.270(2)(h), the court considered the "extent to which the child has been cared for, nurtured, and supported by any de facto custodian[s,]" KRS 403.270(2)(i) the "intent of the . . . parents in placing the child with a de facto

custodian[,]" and KRS 403.270(2)(j) the "circumstances under which the child was placed or allowed to remain in the custody of a de facto custodian[.]" The court found that the Higdons were granted temporary custody of Child in the district court case after both her parents lost custody primarily due to their substance abuse issues. It found that "[t]he amount of time the child was away from [Rachel and Dylan] was exacerbated by the length of time it took [them] to complete their case plan in a manner sufficient to convince the district court that Child could be safely returned to them."

Under KRS 403.270(2)(k), the court considered the "likelihood a party will allow the child frequent, meaningful, and continuing contact with the other parent or de facto custodian[.]" It found no evidence the Higdons would prevent Rachel and Dylan from seeing Child or being involved in her life, and noted that Ashley Higdon attended the WIC appointment for Child, which made it easier for Child's parents to have her in their care. On the other hand, Rachel and Dylan stopped extended visitation with the Higdons in retaliation against what they perceived as the Higdons using the visitation against them in the custody dispute. The court concluded that this indicated a potential for interference by Rachel and Dylan in the relationship between Child and the Higdons.

The evidence cited by Rachel – that she made ongoing, sustained efforts to regain custody, that she has a good relationship and strong bond with

Child, and that it would be beneficial for Child to spend time with her siblings –
does not alter the fact that the findings made by the circuit court are supported by
substantial evidence, which is evidence of sufficient probative value to induce
conviction in the minds of reasonable people. *Kentucky State Racing Commission
v. Fuller*, 481 S.W.2d 298, 308 (Ky. 1972). "[J]udging the credibility of witnesses
and weighing evidence are tasks within the exclusive province of the trial court."
*Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003) (footnotes and citations
omitted). Simply because there is some evidence to support Rachel's argument
does not render the circuit court's findings clearly erroneous or warrant reversal of
the judgment.

**(iii) The circuit court did not improperly delegate its responsibility in making
findings of fact and conclusions of law**

Rachel argues that the circuit court erred in adopting the report of the
DRC, which in turn was based on proposed findings tendered by the Higdons.
"[T]he delegation of the clerical task of drafting proposed findings of fact and
conclusions of law under the proper circumstances does not violate the trial court's
responsibility." *Bingham v. Bingham*, 628 S.W.2d 628, 629–30 (Ky. 1982)
(citation omitted). The primary concern is "that the trial court does not abdicate its
fact-finding and decision-making responsibility under CR 52.01." *Id*. Our review
of the circuit court's orders shows that the court was fully engaged with the
evidence in this case. Although the DRC drafted the tendered findings, the circuit

-13-

court made several revisions and additions. Its findings of fact, conclusions of law, and the amended findings of fact and conclusions of law are not identical to the Higsdons' tendered findings and show that the court carefully and independently considered Rachel's arguments. "[T]here was no verbatim or mechanical adoption of proposed findings of fact and conclusions of law in the present action." *Id*. There is simply no indication "that the decision-making process was not under the control of the trial judge, nor that these findings and conclusions were not the product of the deliberations of the trial judge's mind." *Id*.

**(iv) The circuit court did not err in holding that the presumption of equal parenting time was overcome**

"Under KRS 403.270, an initial determination of custody requires consideration of the best interests of the child, with a rebuttable presumption that joint custody and equal parenting time is in the child's best interests." *Layman v. Bohanon*, 599 S.W.3d 423, 430 (Ky. 2020). The circuit court held that the Higdons had overcome the presumption of equal parenting time. It found that Ashley Higdon was the primary caretaker of the child and had taken her to all her doctor's appointments since July 2022. Even after Child was returned to the custody of Rachel and Dylan, Ashley continued to be the person who sought medical care for Child when she was sick, even though the parents took themselves to the doctor for their own health needs. Rachel did take Child to one well-care visit. Ashley took Child to her WIC appointment to re-establish Child's benefits

-14-

after custody was returned to Rachel and Dylan. Rachel had previously asked the district court to allow her to go to Child's medical appointments, but after the district court granted her request, she failed to attend any appointments. The court stated, "Unpersuasively, Rachel testified she did not understand she was able to take [Child] to the doctor despite having custody and previously having been granted permission to attend the medical appointments." The court found that the Higdons "provided all financial support for Child while in their care, and even provided formula for her before she was removed from her parents. The parents, though employed, did not provide any financial support, food, clothing or other necessary care for [Child] while she in the care of [the Higdons]."

The court concluded:

> [Rachel and Dylan] have been unable to provide sufficient evidence to overcome the presumption that [the Higdons] should not share equally in parenting time with Child. [The Higdons] seem to be the actual primary care providers even when [Rachel and Dylan] were the custodians. However, based on the vindictive type behavior in stopping contact after the hearing, failing to properly care for [Child's] medical needs or even attend doctor appointments, and failing to support their child when having the financial ability to do so rebuts the presumption of shared parenting time by a preponderance of the evidence as required by KRS 403.270(2)[.]

The circuit court's conclusion that the Higdons should be the primary residential custodians was based on substantial evidence that the Higdons had served as Child's primary caregivers for most of her life, even after Rachel and

-15-

Dylan regained custody. The Higdons made sure that Child went to medical appointments and took medicine as directed. The court was also concerned that Rachel and Dylan would withhold Child from the Higdons in a retaliatory manner. The court's findings meet the preponderance of the evidence standard for overcoming the presumption of equal parenting time.

**(v) The circuit court did not err in not granting Rachel greater parenting time**

Rachel argues that the trial court should have entered specific orders maximizing her parenting time with Child, rather than granting her standard visitation. Rachel further contends the court failed to acknowledge her work schedule or the close proximity in which the parties live. She does not specify what parenting schedule she would prefer, nor where this argument is preserved in the record. She also claims that the court failed to acknowledge the importance of Child sharing more time with her siblings, but the court did make a specific reference to the ordered visitation coinciding with that of Child's half-sibling. Rachel has not offered sufficient grounds for altering the amount of parenting time granted by the trial court.

## CONCLUSION

For the foregoing reasons, the amended findings of fact, conclusions of law, and judgment, entered on September 9, 2024, are affirmed.

MOYNAHAN, JUDGE, CONCURS.

CETRULO, JUDGE, CONCURS IN PART, DISSENTS IN PART, AND FILES SEPARATE OPINION.

CETRULO, JUDGE, CONCURRING IN PART AND DISSENTING IN PART: Respectfully, I concur in part but dissent in part as I would remand for the circuit court to address the presumption of equally shared parenting time under KRS 403.270. The court's judgment did set out the factors weighed under KRS 403.270 as to the best interests of the child. However, the court did not set forth any findings as to why Dylan and Rachel were basically given only every other weekend parenting time. The judgment states simply "the petitioners have overcome the presumption of shared equal parenting time." There is no indication of any evidence presented to overcome that presumption.

All parties reside in close proximity to each other in the same county. KRS 403.270 creates a presumption rebuttable by a preponderance of evidence, that equally shared parenting time is in the best interests of the child. Further, if a deviation from equal time is warranted, the court is to construct a schedule that maximizes the parents' time with the child. Here, the court found joint custody was appropriate but then awarded the parents only "standard" non-custodial visitation.

I would remand for further proceedings as to the time-sharing and for specific findings as to why more equal time was not awarded or for a schedule that maximizes the parenting time for these joint custodians.

-17-

BRIEF FOR APPELLANT:

Earlene Whitaker Wilson
Leitchfield, Kentucky

BRIEF FOR APPELLEES VEGAS
AND ASHLEY HIGDON

William D. Tingley
Covington, Kentucky