**COMMONWEALTH of Kentucky, CABINET FOR FAMILIES AND CHILDREN, as next friend of T.L.M., a child, and M.L.M., a child, Appellant,**

**v.**

**G.C.W.; T.L.M.; and M.L.M., Appellees.**

**No. 2003–CA–000665–MR.**

Court of Appeals of Kentucky.

May 28, 2004.

Case Ordered Published by
Court of Appeals July 16, 2004.

Mona S. Womack, Owensboro, KY, for Appellant.

No Brief for Appellee.

Before EMBERTON, Chief Judge; COMBS and TACKETT, Judges.

## OPINION

COMBS, Judge.

The Cabinet for Families and Children (Cabinet) appeals the judgment of the Daviess Circuit Court dismissing its petition to terminate the parental rights of the appellee, G.C.W., as to her two minor children while ordering that they remain in the custody of the Cabinet. The appellant argues that the trial court erred in concluding that termination of G.C.W.'s rights was not in the best interest of the children. The Cabinet contends that the evidence dictated an opposite result. It also cites in support of its policy arguments the objectives of the Adoption and Safe Families Act of 1997, 42 U.S.C. §§ 620–632, 670–679. After reviewing the evidence, we agree that the trial court erred in dismissing the Cabinet's petition. Therefore, we reverse.

Four children were born to G.C.W. and her husband, L.M. Following L.M.'s death in 1993, G.C.W.'s oldest child revealed that she had been sexually molested by her father. G.C.W. responded by placing her daughter in foster care. By May of 2000, all four children had been placed in foster care after their mother had filed her petition for their commitment to the Cabinet's care, alleging that the children were beyond her control. When the Cabinet filed its petition to terminate G.C.W.'s rights in July 2002, only two of the children were not yet emancipated: T.L.M., a son born on July 6, 1986, and M.L.M., a daughter born on September 20, 1988. These two minor children are the subject of this appeal.

A hearing in the matter was conducted in February 2003. The Cabinet's evidence in support of its petition to terminate G.C.W.'s parental rights was virtually undisputed. T.L.M. was sixteen years of age at the time of the hearing; M.L.M. was fourteen years of age. They had been committed to the custody of the Cabinet in June of 2000. At the time of the hearing, they had been in foster care continuously for nearly three years. G.C.W. had only minimal contact with the children after their commitment to the Cabinet in June 2000. She had *no* contact with them during the eight months immediately preceding the February 2003 hearing.

Brandon Harley, an employee of the Cabinet and the family's case manager, testified about the Cabinet's efforts to reunite the family—which included four separate case plans. Harley stated that G.C.W., who struggled with alcohol addiction, initially cooperated with the treatment program designed for her. However, she failed to follow the plans or to utilize the services provided to her. Spe-

cifically, he testified that she failed to attend AA meetings or to keep appointments with mental health counselors; she eventually stopped having any contact with him. Harley testified that both children desired to have G.C.W.'s parental rights terminated and that T.L.M.'s foster parents were willing to adopt him.

The Cabinet called Dr. Bruce Fane, the psychologist and certified juvenile sex abuse counselor who provided intensive treatment to T.L.M. Dr. Fane testified that G.C.W. refused to discuss her son's case with him and declined his invitation to participate in counseling with T.L.M. Noting that T.L.M. had made remarkable progress in all areas of concern, he urged termination of G.C.W.'s rights so that T.L.M.'S foster parents could adopt him.

The Cabinet presented evidence from several sources that all three of G.C.W.'s daughters had been sexually abused while in her custody either by their father or by G.C.W.'s boyfriend after her husband's death. In the case of M.L.M., both her mother's boyfriend and her own brother, T.L.M., had sexually abused her. While the evidence did not indicate that G.C.W. encouraged or participated in the sexual abuse, it did establish that she failed to respond appropriately upon learning of the abuse. G.C.W. admitted that when she learned about the abuse of her oldest daughter, she placed her in foster care; she explained her decision by stating that she "could not deal with" her daughter's problems after losing her husband.

With respect to the sexual abuse of M.L.M. by G.C.W.'s boyfriend, G.C.W. testified that she "did not want to believe" her daughter's accusations and that she doubted her claims of abuse. It was only after similar allegations of abuse by her second oldest daughter about a year later that G.C.W. took any action to protect M.L.M. from the perpetrator of the sex crimes.

In defending the charges raised in the Cabinet's petition, G.C.W. attributed many of her problems in raising her children to her addiction to alcohol. She testified that she had been sober for two years and that she was gainfully employed. Although she claimed that she had been in a stable marital relationship with Mr. W. for more than a year, she candidly admitted that she and her husband were not ready to have the children live in their home. She blamed the Cabinet and/or her children's foster parents for the fact that she had neither visited with nor talked to her children for nearly a year, alleging that the foster parents had turned her children against her.

Nevertheless, G.C.W. admitted that she had failed to comply with the Cabinet's reunification plans. She acknowledged the likelihood that T.L.M. and M.L.M. would never live with her again. However, she believed that overnight visitation was possible.

At the close of the evidence, the trial court announced its findings from the bench. Beginning with its observation that there was no "good answer" to the situation, the court found that the children had been harmed in G.C.W.'s care and that they "didn't deserve" to be put out of their home and placed in foster care. Nevertheless, the court did not attribute their situation to "evil intentions" on the part of G.C.W. Rather, the trial court found that as a parent G.C.W. was both ill-equipped and deficient in providing appropriate parenting. The court described her propensity for searching for easy answers to complex problems as well as her pattern of engaging in destructive personal relationships. The court was specific and critical as to her poor judgment and the hazardous results flowing from it. It was particularly

troubled that G.C.W. had initiated no contact with her children for extended periods of time.

In light of those findings, the court stated that it would terminate G.C.W.'s parental rights if it believed that any advantage would result to the children. However, it found no such advantage. Although it acknowledged that the children should not be returned to their mother's care, the court rejected Dr. Fane's opinion that termination of G.C.W.'s rights would be instrumental in T.L.M.'s emotional recovery. It declared that termination was not a "psychological event" and that it "wouldn't shut any doors" on what had happened to the children. Emphasizing that the children were already of a sufficient age to comprehend what had happened to them, the court determined that they were going to have to "deal with" the damaging events in their lives regardless of G.C.W.'s legal status as their mother.

Finally, the court addressed the Cabinet's argument (in which the guardian *ad litem* had joined) that the best interests of the children warranted termination of G.C.W.'s rights in order to enable them to be placed for adoption. It alluded to recent negative accounts of long-term foster care, which have described the system as a "no man's land for children". Nevertheless, the court expressed the belief that there are numerous parents who are not truly qualified for parenting but who should nonetheless be permitted to have some contact with their children. The court also entertained the possibility that as the children matured, the family might be able to mend its relationship. Citing the ages of the children, the court found it was unlikely that they would be adopted—even though such an offer had been made as to the older of the two. So reasoning, the trial court concluded it was not in best

interest of either child to terminate the mother's rights.

In the final judgment entered on February 28, 2003, the court ordered that the children remain in the custody of the Cabinet until their eighteenth birthdays. It also provided that visitation with G.C.W. should occur only in the event that the children desired to see their mother.

The standards governing appellate review require us to accord considerable deference to the findings of the trial court. *V.S. v. Commonwealth, Cabinet for Human Resources*, Ky.App., 706 S.W.2d 420 (1986). Its findings cannot be disturbed unless there is no substantial evidence in the record to support them. *R.C.R. v. Commonwealth, Cabinet for Human Resources*, Ky.App., 988 S.W.2d 36 (1998).

In this appeal, the Cabinet contends that there is no evidence supporting the court's conclusion that termination of G.C.W.'s parental rights was not in the best interests of these children. Observing that the evidence conclusively reveals that the children will never be reunified with their mother, the Cabinet argues that leaving them in permanent foster care is not an appropriate solution. It proposes that the court's ruling leaves the children "in limbo" and that their best interest dictates their placement for adoption. G.C.W. has not filed a brief nor has she otherwise responded to the Cabinet's arguments in this appeal.

The involuntary termination of parental rights is governed by KRS [1] 625.090. Before a circuit court may terminate such rights, it must find—by clear and convincing evidence—(1) that the child is an "abused or neglected child, as defined by KRS 600.020(1)" and (2) that termination would be in the child's best interest. KRS 625.090(1). After that threshold is met,

---

1. Kentucky Revised Statutes.

the court must find the existence of one of the numerous grounds recited in KRS 625.090(1) (including abandonment, infliction of serious physical injury or emotional harm, sexual abuse, or neglect in providing access to basic survival needs) in order to terminate parental rights.

■ Although the trial court did not make an explicit finding that T.L.M. and M.L.M. were abused or neglected as contemplated by KRS 600.020(1), such a finding was clearly implied in its overall findings as recited from the bench. However, the evidence did establish that the children were "abused or neglected" according to several of the criteria of the following relevant portions of KRS 600.020(1):

> "Abused or neglected child" means a child whose health or welfare is harmed or threatened with harm when his parent, guardian, or other person exercising custodial control or supervision or the child:
>
> . . .
>
> (c) Engages in a pattern of conduct that renders the parent incapable of caring for the immediate and ongoing needs of the child including, but not limited to, parental incapacity due to alcohol and other drug abuse as defined in KRS 222.005(12);
>
> (d) Continuously or repeatedly fails or refuses to provide essential parental care and protection for the child, considering the age of the child;
>
> . . .
>
> (f) Creates or allows to be created a risk that an act of sexual abuse, sexual exploitation, or prostitution will be committed upon the child;
>
> (g) Abandons or exploits the child; or
>
> . . .
>
> (i) Fails to make sufficient progress toward identified goals as set forth in the court-approved case plan for the

safe return of the child to the parent that results in the child remaining committed to the cabinet and remaining in foster care for fifteen (15) of the most recent twenty-two (22) months[.]

The evidence leaves no doubt that T.L.M. and M.L.M. were abused and neglected as contemplated and defined by statute. The children had been in foster care for thirty-two (32) continuous months—nearly three years—at the time of the hearing. (Subsection (i)) G.C.W. admitted that she had failed to make sufficient progress with the case plans designed to reunite the family. *Id.* G.C.W. admitted to having no contact with the children—or even attempting any contact—for more than eight months. *Id.* at (g). G.C.W. acknowledged that Dr. Fane attempted to have her participate in counseling with T.L.M. and that she refused to do so. *Id.* at (i). G.C.W.'s selection of romantic partners resulted in devastating consequences for all three of her daughters. *Id.* at (f).

Compelling evidence of record established beyond any doubt the existence of several of the statutory grounds for termination set forth in KRS 625.090(2). It is not disputed: (1) that G.C.W. had abandoned the children "for a period of not less than ninety (90) days" (KRS 625.090(2)(a)); (2) that by failing to believe M.L.M.'s claims of sexual abuse, she "allowed the child to be sexually abused or exploited" (625.090(2)(f)); and (3) that the children had "been in foster care under the responsibility of the cabinet for fifteen (15) of the most recent twenty-two (22) months" prior to the filing of the petition (625.090(2)(j)).

■ The central issue in this appeal concerns the findings of the trial court as to the best interests of the children. The statutory framework provides the following criteria to guide a trial court in its consideration of the best interests of a

child in the context of an action to terminate parental rights:

> In determining the best interest of the child and the existence of a ground for termination, the Circuit Court shall consider the following factors:
>
> . . .
>
> (b) Acts of abuse or neglect as defined by KRS 600.020(1) toward any child of the family;
>
> (c) If the child has been placed with the cabinet, whether the cabinet has, prior to the filing of the petition made reasonable efforts as defined in KRS 620.020 to reunite the child with the parents . . .
>
> (d) The efforts and adjustments the parent has made in his circumstances, conduct, or conditions to make it in the child's best interest to return him to his home within a reasonable period of time, considering the age of the child;
>
> (e) The physical, emotional, and mental health of the child and the prospects for the improvement of the child's welfare if termination is ordered[.]

KRS 625.090(3).

The Cabinet contends that the trial court ignored the statutory criteria and cited considerations that are neither pertinent nor supported by the evidence. The Cabinet objects most strenuously to the court's reference to the children's ages and their awareness of the identity of their biological mother as a basis for eliminating any possibility of their adoption and hope of an alternative to the foster care system. Relying on the provisions of the Adoption and Safe Families Act of 1997 (AFSA), the Cabinet argues as follows:

> One of the key tenets of ASFA is that foster care is temporary—it is never intended to be a permanent living situation. There is no long term stability in

such a situation. Foster parents can stop being foster parents at any time. Children are then left to bounce around from foster home to foster home with no one willing to commit to parenting. The Cabinet sought termination of parental rights so that it could secure a permanent adoptive home for these children. However, the Court's Order leaves the children with no permanent placement, a violation of the Adoption and Safe Families Act.

(Appellant's brief, p. 11).

Congress overwhelmingly passed the AFSA to expedite the adoption of children in foster care and to address the phenomenon labeled as "foster care drift." *See,* 42 U.S.C. § 675(5)(c)(2000); Gordon, *Drifting Through Byzantium: The Promise and Failure of the Adoption and Safe Families Act of 1997,* 83 Minn.L.Rev. 637, 650–651 (1999). In response to the AFSA, the Kentucky General Assembly made significant changes affecting the termination of parental rights: (1) the definition of an "abused and neglected" child was amended to include a child left to linger in foster care for 15 of the last 22 months (KRS 600.020(1)(i)); and (2) the grounds for termination enumerated in KRS 625.090(2) were enhanced to include a "15/22 month" provision (KRS 625.090(2)(j)).

By enacting time limits to conform to the AFSA, it is clear that our legislature intended to leave children in foster care for as brief a time as possible. The time limits within which parents must make the necessary changes for reunification of the family (or risk possible termination of their rights) are applicable regardless of the age of their child in foster care. The Cabinet correctly argues that although T.L.M. and M.L.M. are teenagers, their right to a safe and stable home should be afforded no less consideration than that afforded to a child of tender age. The statute does not place

any age limit on the right of a child to have his best interests weighed in the balance.

The court's finding that adoption of the children is unlikely is not a relevant consideration. Nor is it supported by the evidence. As we have already stated, the record establishes that there is a strong likelihood that T.L.M. may be adopted by his foster parents. Even though there was no similar evidence as to M.L.M., the testimony established that it was in the best interest of both children to be free of their ties to G.C.W. in order to be eligible for adoption.

The court also found that termination was not psychologically capable of solving the children's problems, addressing the standard contained in KRS 625.090(3)(e). We agree that termination alone cannot undo the harm suffered by T.L.M. and M.L.M. However, the evidence before the court, particularly from Dr. Fane, indicated that termination was at least one part of the solution. On the contrary, no evidence indicated any benefit to the children as a result of maintaining a legal tie with their mother.

After careful review of the record, we conclude that the determination of the court with respect to the children's best interest was clearly erroneous under the pertinent statutory criteria. By clear and convincing evidence, the Cabinet demonstrated that G.C.W. placed her children with the Cabinet because she could not deal with their problems; that she had no interaction with them for nearly a year; that she did not substantially comply with her case plan or make the necessary changes to expedite their safe return home; that she was either unable or unwilling to care for their needs; and in the case of M.L.M., that she could not or would not protect her from sexual molestation. The totality of overwhelming evidence does not reasonably support the finding of the trial court with respect to the best interest of these children.

In light of the absence of any evidence that the children and G.C.W. will ever be reunited, we hold that the children's best interest dictates that their mother's rights be terminated so that they are free for adoption.

The judgment of the Daviess Circuit Court is reversed, and this matter is remanded for entry of a judgment consistent with this opinion.

ALL CONCUR.