RENDERED:  AUGUST 30, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1439-ME

L.W., MOTHER                                                                                      APPELLANT


APPEAL FROM MCCRACKEN CIRCUIT COURT
v.          HONORABLE DEANNA WISE HENSCHEL, JUDGE
ACTION NO. 23-AD-00045


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES; K.M.C., A
MINOR CHILD; AND M.C., FATHER                                          APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, A. JONES, AND KAREM, JUDGES.

JONES, A., JUDGE:  L.W. ("Mother") appeals the McCracken Circuit Court's

order terminating her parental rights to her minor child, K.C. ("Child").  Following

a careful review of the record and all applicable law, we affirm.

# I.   BACKGROUND

Child was born on November 3, 2020.  On May 13, 2021, the Cabinet

for Health and Family Services ("Cabinet") received a report indicating that

Mother and Father (collectively referred to as "Parents") had, among other issues,

used marijuana around Child, left Child unsupervised for long periods, and that

Child had suspicious facial injuries.  The report was assigned to social worker

Cassie Steele.  That same evening, Child was taken to the hospital by her maternal

grandparents due to bruising on her face.  While Child was at the hospital, Ms.

Steele was contacted again regarding the situation.  Child was subsequently taken

to Norton Children's Hospital in Louisville for a forensic assessment.  Erin Graves,

a Cabinet employee and Ms. Steele's supervisor, accompanied Child to Norton.

During the trip, Ms. Graves observed significant injuries to Child's face.

On May 14, 2021, the Cabinet filed a dependency, neglect, and abuse

("DNA") petition pursuant to KRS[1] 620.070 and was granted emergency custody

of Child that same day.[2]  KRS 620.060.  The family court conducted a temporary

custody hearing on May 19, 2021.  Following the hearing, the family court entered

an order for Child to remain in the Cabinet's temporary custody pending resolution

of the DNA matter.  The family court held an adjudication hearing on July 1, 2021.

---

[1] Kentucky Revised Statutes.

[2] Ms. Graves signed the petition on the Cabinet's behalf.

Thereafter, it found that neglect and/or abuse had been proven by a preponderance of the evidence. Specifically, the family court found that Parents created, or allowed to be created, a risk of physical or emotional injury by other than accidental means. KRS 600.020(1). The family court concluded that Child sustained injuries which the family court believed were due to physical abuse by Parents. The family court held a disposition hearing on July 15, 2021, the result of which was an order continuing Child's custody with the Cabinet and ordering Parents to work with the Cabinet and complete their case plans.

On July 28, 2023, the Cabinet filed a petition for the involuntary termination of Parents' parental rights. KRS 625.050. A final termination hearing was scheduled for November 2, 2023. On October 31, 2023, Mother filed a motion requesting the family court to continue the final hearing. Among other reasons, Mother requested the continuance so that her criminal trial for child abuse could be completed prior to the termination hearing.[3] The Cabinet pointed out that Child had already been in foster care for over two years and objected to any continuance on the ground that it would prejudice Child's right to timely permanency. It also noted that it had requested a trial date during the September 14, 2023, pretrial conference, and KRS 625.080(5) requires the final termination

---

[3] As will be discussed in more detail below, Mother was indicted for criminal abuse of Child in violation of KRS 508.100(1) on or about July 23, 2021.

-3-

hearing to take place no later than sixty days after such a request.  The family court

denied Mother's motion.

The final termination hearing commenced on November 2, 2023.  The

Cabinet called three of its employees to testify on its behalf:  1) Ms. Graves, the

investigative supervisor who oversaw the DNA matter through adjudication; 2)

Cher Youngblood, the family's ongoing social worker; and 3) McKinzie Nelson,

the social services aide who was responsible for coordinating Parents' scheduled

visits with Child and transporting Child to the visits.

Ms. Graves testified that she collaborated with Ms. Steele on this

matter and was involved from the time of the initial report through the adjudication

hearing.[4]  Additionally, Ms. Graves was directly involved in the DNA action

insomuch as she signed the DNA petition and personally transported Child to

Norton for the forensic assessment.  Ms. Graves explained that based on the report

from Child's maternal grandmother, Child's physical appearance, and the opinion

of Child's medical providers, the Cabinet suspected Child was in danger,

prompting it to file the DNA petition on Child's behalf.

Of importance to the instant appeal, in addition to her personal

observations, Ms. Graves was permitted to read portions of Ms. Steele's report into

---

[4] By the time the final hearing took place, Ms. Steele was no longer employed by the Cabinet, and it elected not to subpoena her to testify on its behalf.

the record notwithstanding Mother's objection that such testimony was hearsay. Over Mother's objection, Ms. Graves was also permitted to read the DNA petition into the record, which included a summary of statements from Child's maternal grandmother to the Cabinet.[5]

The Cabinet next called Sherry Youngblood. Ms. Youngblood was assigned as this family's ongoing caseworker. Following the adjudication hearing, Ms. Youngblood developed case plans for Parents and monitored their progress in completing those plans. According to Ms. Youngblood, Parents were only partially compliant with their case plans. While both Mother and Father completed parenting classes, they failed to fulfill the bulk of their required tasks and continued to test positive for THC, the principal psychoactive compound in marijuana. Specifically, Mother did not undergo counseling, participate in an intensive outpatient substance abuse program, or complete anger management classes. Additionally, at the time of the final hearing, Mother owed the Cabinet approximately $144.00 in back child support.[6] Parents canceled all four of their scheduled home visits with the Cabinet and had not visited with Child since July 2023. During the visits Mother had with Child, she appeared to be preoccupied with her phone. When Mother did pay attention to Child, she appeared more

---

[5] Child's maternal grandmother passed away prior to the final hearing.

[6] Mother had been ordered to pay $60.00 per month.

concerned with examining Child's body for physical marks than with interacting with Child. Mother also appeared to become easily frustrated when Child misbehaved. Ms. Youngblood further testified that Child was in a supportive adoptive foster home and was thriving. Notably, Ms. Youngblood testified that Child's low weight was a concern when she was removed from Parents' care but since removal Child had gained weight and appeared to be developing normally.

Ms. Nelson was the Cabinet's final witness. She provided details regarding Parents' compliance (or lack thereof) with their visitation schedule. According to Ms. Nelson, Parents were fairly consistent with their visitation until the last six months or so. After they began missing visits without providing advance notice, the Cabinet required them to call and confirm their intent to show up by eight o'clock on the morning of any scheduled visit and reduced their visitation from weekly to biweekly. According to Ms. Nelson's records, Parents had not seen Child since July 2023.

The Cabinet rested its case after Ms. Nelson finished testifying. Parents did not testify or present any other proof. Thereafter, on November 3, 2023, the family court entered an order terminating both Mother's and Father's parental rights. The family's court order was accompanied by detailed findings of fact and conclusions of law, which state, in pertinent part:

> 14. The Court finds, by clear and convincing evidence in this action that the child has been abused or neglected by

[Parents]. The Court hereby finds pursuant to KRS 600.020(1)(a)(4) that [Parents] have continuously or repeatedly failed or refused to provide essential parental care and protection for [Child], considering the age of [Child]; did not provide [Child] with adequate care, supervision, food, clothing, shelter, education, or medical care necessary for [Child's] wellbeing pursuant to KRS 600.020(1)(a)(8) and [have] failed to make sufficient progress on the Court approved case plan to allow for the safe return of [Child] to [Parents] that results in [Child] remaining committed to the Cabinet and remaining in foster care for fifteen (15) cumulative months out of forty-eight (48) months pursuant to KRS 600.020(1)(a)(9).

15. The Court finds there are several barriers to the reunification of [Parents] with [Child]. [Parents] have had a case plan with the Cabinet for almost two (2) years. Despite numerous case plans and interventions, the Respondent [Parents] have amply not worked a case plan for the successful reunification of [Child]. This case started as a physical abuse case. [Child] had significant bruising to her face that was indicative of child physical abuse. [Parents] have not completed any anger management or mental health treatment that would ensure this Court that [Child] could be safely returned to [Parents].

16. The Court finds [Parents] have failed to work their case plans such that reunification with [Child] is not feasible in the foreseeable future. The [Cabinet] has made all reasonable efforts toward reunification of [Child] and [Parents]. [Parents] have not made significant progress such that [Child] can be returned. They have given no reason or explanation as to why they have not made progress on their case plans. They have done parenting classes and that is all. This case is much more complex than that and parenting classes do not fix these issues. [Child] was very small and had significant injuries to her face. The Court would be extremely

concerned for her safety if she were to be returned to [Parents'] care. They have not taken this case seriously and have not even tried to work a Case Plan. [Child] has been in the care of the Cabinet for two (2) years already. She deserves permanency. The Court cannot return [Child] to [Parents] anytime in the near future. The Court must terminate their parental rights.

17. The Court further finds that [Child's] physical, mental, and emotional needs have been met while in the Cabinet's care and custody, and [Child] is expected to make further improvements in these areas upon termination of parental rights. The Cabinet foresees no barriers to adoption at this time. Termination of parental rights is in the best interest of [Child] and the [Cabinet] has facilities available to accept the care, custody, and control of [Child] and is the agency best qualified to receive custody of her.

18. The Court finds that the Cabinet considered all appropriate relatives and was unable to find anyone. The Court has had numerous, lengthy hearings in regard to relatives and does not believe placement with any relatives to be in the best interest of [Child].

Based on the foregoing Findings of Fact, the Court makes the following Conclusions of Law:

1. The first prong of the termination statute requires that the child be deemed abused or neglected, as defined by KRS 600.020(1), by a Court of competent jurisdiction or in this proceeding. Both have been met. [Child] was found to be abused or neglected by McCracken County Family Court on July 1, 2021 in Case No. 21-J-00115-001.

2. [Child] is found in this proceeding to be abused or neglected by [Mother] and [Father], as defined in KRS 600.020(1). [Mother] and [Father] have continuously and repeatedly failed or refused to provide essential

-8-

parental care and protection for [Child], considering the age of the [Child], KRS 600.020(1)(a)4; have not provided the child with adequate care, supervision, food, clothing, shelter, and education or medical care necessary for [Child's] wellbeing, KRS 600.020(1)(a)8; and have failed to make sufficient progress toward the Court approved case plan to allow for the safe return of [Child] to [Parents] that results in [Child's] remaining committed to the Cabinet for fifteen (15) cumulative months out of forty-eight (48) months.

3.  Second, the Court must determine that termination of parental rights is the Child's best interest KRS 625.090(1)[(c)].  In this case the Court finds it is in [Child's] best interest that the parental rights of [Mother] and [Father] be terminated KRS 625.090(1)[(c)].  The Court previously identified those factors it must consider, to the extent relevant, in analyzing the best interest standard.  KRS 625.090(3)(c) requires the Family Court to consider whether the Cabinet has, prior to the filing of the Petition, made reasonable efforts as defined in KRS 620.020 to reunite the child with the parents.  Reasonable efforts are defined by KRS 620.020(13) "as the exercise of ordinary diligence and care by the department to utilize all preventive and reunification services available to the community . . . which are necessary to enable the child to a safely live at home[.]"  The Court finds the Cabinet has rendered all reasonable reunification services to [Parents].  The Cabinet offered [Parents] a case plan containing numerous services.  [Mother] has had a case plan since May of 2021, continually.  [Mother] and [Father] have not made sufficient case plan progress to have [Child] returned to them.  They have not given any reason or explanations as to why they have not completed the tasks on their case plan, they simply have not done so.  Accordingly, the Court finds the Cabinet made reasonable efforts.  Ms. Youngblood testified, and the Court finds her testimony persuasive, that the Cabinet has exhausted its resources and there are no additional services that the Cabinet could offer [Mother] and

[Father] that would result in reunification of [Parents] with [Child] in the foreseeable future. This factor weighs in favor of termination. KRS 625.090(3)(d) looks at "[t]he efforts and adjustments the parent has made in his circumstances, conduct, or conditions to make it in the child's best interest to return him to his home within a reasonable period of time, considering the age of the child." [Parents] have made insufficient adjustments in their circumstances such that they can safely parent [Child]. Despite all the case planning and services provided, [Parents] did not adequately participate in their case plan. [Parents] have not made sufficient case plan progress in order to have [Child] returned to them. This factor weighs heavily in favor of termination. KRS 625.090(3)(e) "takes into account the child's physical, emotional, and mental health coupled with whether improvement will continue if termination is ordered " *K.H.*, 423 S.W.3d at 213.[7] [Child] has made significant improvements while in foster care. [Child] has been in the same home since removal. This is the only home that [Child] knows. She has been there since she was six (6) months old. She is thriving in this home and is extremely bonded to her foster parents. The Court absolutely refuses to gamble with her health and safety by returning [her] to [Mother] and [Father]. Considering all the evidence presented in this case, including the statutory factors identified in KRS 625.090(3), the Court is convinced termination of [Mother's] and [Father's] parental rights is in [Child's] best interest.

5. Third and finally the Court must find at least one ground of parental unfitness enumerated in the statute KRS 625.090(2). The following subsections are at issue in this case (e) (g) and (i).

6. [Mother] and [Father] for a period of not less than six (6) months, have continuously or repeatedly failed or refused to provide or [have] been substantially incapable

---

[7] *Cabinet for Health and Family Services v. K.H.*, 423 S.W.3d 204 (Ky. 2014).

of providing essential parental care or protection for [Child], and there is no reasonable expectation of improvement in parental care and protection, considering the age of [Child]. KRS 625.090(2)(e); 600.020(1)(a)4.

7. [Mother] and [Father] for reasons other than poverty alone, have continuously or repeatedly failed to provide or are incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for [Child's] wellbeing and there is no reasonable expectation of significant improvement in their conduct in the immediately foreseeable future, considering the age of [Child]. KRS 625.090(2)(g); 600.020(1)(a)8.

8. [Child] has been in foster care under the responsibility of the Cabinet for fifteen (15) months out of forty-eight (48) months preceding the filing of the Petition for Termination of Parental Rights. KRS 625.090(2)(j).

9. The Cabinet has been offering this family services for a significant period of time. It has exhausted its resources. Given the efforts made by the Cabinet to reunify this family, no additional services are likely to bring about parental adjustments enabling a return of [Child] to [Parents] within a reasonable time, considering the age of [Child].

10. [Mother] and [Father] failed to prove, by a preponderance of the evidence, that [Child] will not continue to be an [sic] abused or neglected as defined in KRS 600.020(1) if returned to [Mother] and [Father]. KRS 625.090(5). [Parents] did not present any proof. The simple fact is that [Mother] and [Father] are not in a position to care for [Child]. [Child] has lingered in foster care long enough. She is finally doing well and is well adjusted. The Court refuses to gamble with her safety, mental health, and wellbeing. Instead, this Court has concluded that termination of parental rights is in the best interest of [Child].

11. The Court has considered the Cabinet's efforts to locate relatives for placement of [Child] and finds that the Cabinet has considered all available relatives and [was] not able to find any appropriate relatives.

12. The [Cabinet] is entitled to a judgment terminating the parental rights of [Parents] to [Child]; moreover, it is in the best interest of [Child] that the parental rights of [Mother] and [Father] be terminated and that custody be transferred to the [Cabinet] as a ward of the Commonwealth, with authority residing in the Cabinet to place [Child] for adoption.

13. The Court has considered evidence pertaining to each enumerated ground in the Cabinet's Petition for Involuntary Termination of Parental Rights and has determined by clear and convincing evidence that the Cabinet has met the burden on each ground independently of each other. Each individual ground for termination found in this action is sufficient for termination of parental rights pursuant to KRS 625.090.

(11/3/2023 Findings of Fact & Conclusions of Law at 11-17.)

On December 1, 2023, Mother filed a notice of appeal.[8] Mother's appeal asserts the family court committed two errors, and she requests us to vacate the order of termination and remand this matter for additional proceedings. First, Mother argues that the family court erred when it did not continue the termination of parental rights hearing until after her jury trial on the related criminal charge of

---

[8] Mother states in her brief that Father "filed a Notice of Cross Appeal on December 13, 2023." No such document appears in this Court's record, and Father has not otherwise taken any action in this appeal.

child abuse.  Second, Mother asserts that the family court erred when it allowed

Ms. Graves to read from Ms. Steele's report and to testify about statements Child's

deceased maternal grandmother made to the Cabinet.  Each argument is addressed

below.

## II. ANALYSIS

### A.  The Family Court's Denial of Mother's Request for a Continuance

On July 23, 2021, Mother was indicted for criminal abuse of Child in

violation of KRS 508.100(1).  The alleged abuse occurred on or around May 11,

2021, and appears to be the same incident of physical abuse central to the

underlying DNA action.  Mother's criminal jury trial was scheduled for January 3-

5, 2024.  Just two days before the final parental termination hearing, on October

31, 2023, Mother filed a motion with family court requesting a continuance of the

termination hearing until after her criminal trial.  The family court summarily

denied Mother's request.[9]  Approximately two months after the family court

terminated Mother's parental rights, a McCracken County jury returned a verdict

finding Mother not guilty of criminal abuse of Child.[10]

---

[9] Mother also cited a pending appeal from the DNA action, which involved the Cabinet's failure to place the child with a relative, and her aunt's grave illness, as additional grounds for requesting a continuance.  However, this appeal does not rely on these factors and is instead focused solely on the family court's failure to grant a continuance pending the outcome of the criminal abuse charge against her.

[10] Mother's criminal case is not part of the record before us.  However, for background purposes, we choose to take judicial notice of her related criminal case.  *See Doe v. Golden & Walters,*

We first address Mother's claim that the family court's refusal to postpone the termination hearing until after her criminal trial violated her constitutional due process rights.[11]  Mother argues that the practical consequence of the family court's ruling was the termination of her parental rights for child abuse, even though a jury of twelve had not yet determined whether she had committed any wrongdoing.

"The Constitution does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings." *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324 (9th Cir. 1995).  Indeed, under our jurisprudence, "[p]arallel civil and criminal cases are permitted and may proceed simultaneously or sequentially" without offending either the United States Constitution or the Constitution of Kentucky.  *Barnes v. Goodman Christian*, 626

---

*PLLC*, 173 S.W.3d 260, 265 (Ky. App. 2005) ("[T]he information contained in the docket sheets is a proper subject for judicial notice.").  Nevertheless, we decline to give substantive weight to Mother's acquittal.  Our evaluation must be based on the facts as they were presented to the family court, which, at that time, had no knowledge of whether Mother would be convicted or acquitted.

[11]Although Mother briefly references the Fifth Amendment, her argument seems to rest more on due process under the Fourteenth Amendment.  This is likely because she did not actually invoke her Fifth Amendment right during the termination hearing.  To preserve such a claim, Mother would have needed to be called as a witness and then formally invoke her Fifth Amendment right to remain silent due to the pending criminal charges.  However, that did not occur.  Instead, after the Cabinet rested its case, both Mother and Father were given the opportunity to present evidence, but both declined.  Furthermore, it is constitutionally permissible for a defendant to be required to choose between testifying in a civil matter and asserting the Fifth Amendment privilege.  *ESG Capital Partners LP v. Stratos*, 22 F. Supp. 3d 1042, 1045 (C.D. Cal. 2014).

S.W.3d 631, 637 (Ky. 2021). Thus, Mother did not have a constitutional right to a continuance.

Additionally, Mother's argument is inherently defective. The criminal jury did not actually determine that Mother did not do "anything wrong" as she claims in her brief. It acquitted her. An acquittal in a criminal prosecution is not a proclamation of factual innocence. *Shatz v. American Sur. Co. of N.Y.*, 295 S.W.2d 809, 814 (Ky. 1955). It is simply "a negative finding that the Commonwealth did not sufficiently prove the commission of a crime." *Id.* "[I]n view of the difference in parties, procedures and degree of proof required; and the possibility that the prosecution may have been wholly inadequate; in the final analysis the verdict of acquittal is not such a fact as would constitute evidence of defendant's civil non-liability." *Id.*; *see also Crosier v. Hunt*, 522 S.W.2d 453, 454 (Ky. 1975) (holding that transcript of record of criminal trial in which mother had been acquitted of criminal charges was not admissible in a civil child custody matter); *Drummond v. Todd Cnty. Bd. of Educ.*, 349 S.W.3d 316, 323 (Ky. App. 2011) (holding that the acquittal of school teacher was irrelevant to the outcome of administrative school hearing where the standards of proof were different); *Gregory v. Commonwealth*, 610 S.W.2d 598, 600 (Ky. 1980) (explaining that a finding that no sodomy occurred in a DNA case where the court removed the children did not preclude a later criminal conviction because "[t]he criminality of [the defendant's] actions

-15-

was not before the [civil] court which was charged generally with the well-being of the children").

While the family court was not constitutionally mandated to grant Mother a continuance pending the outcome of her criminal case, continuances are permitted "when the interests of justice seem . . . to require such action." *Maze v. Kentucky Judicial Conduct Commission*, 575 S.W.3d 204, 210 (Ky. 2019) (quoting *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368, 1374 (D.C. Cir. 1980)). Before the lower court, the burden is on the movant to prove that the interests of justice require a continuance of the civil matter during the pendency of a parallel criminal prosecution. *Maze,* 575 S.W.3d at 210. To meet this burden, the movant must explain "with particularity how his or her case will suffer if the motion to postpone is denied." *Bartley v. Commonwealth*, 400 S.W.3d 714, 733 (Ky. 2013).

Determining whether to grant a continuance is a "situation-specific task." *Lehmann v. Gibson*, 482 S.W.3d 375, 384 (Ky. 2016) (quoting *State v. Deal*, 740 N.W.2d 755, 765 (Minn. 2007)). It requires the court to examine the "idiosyncratic circumstances of the case before it." *Id.* The court must weigh "the interests of litigants, nonparties, the public, and the court itself." *Id.* Among other factors, the court should usually consider: (1) the overlap between the civil and criminal cases; (2) the status of the criminal proceeding; (3) the interests of any parties in staying the civil proceeding; (4) the prejudice to any parties from staying

-16-

the civil proceeding; (5) the interests of any nonparties; (6) court convenience; and (7) the public interest in the pending civil and criminal actions. *Id.*; *see also Maze*, 575 S.W.3d at 210.

"Trial courts generally have broad discretion when ruling on a motion for a continuance, and appellate courts will not interfere in the exercise of that discretion unless it is clearly abused." *Stallard v. Witherspoon*, 306 S.W.2d 299, 300 (Ky. 1957); *see also Pope v. Commonwealth*, 629 S.W.3d 5, 13 (Ky. 2021). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). "[A]buse of discretion applies in [] situations where, for example, a court is empowered to make a decision – of *its* choosing – that falls within a range of permissible decisions." *Miller v. Eldridge*, 146 S.W.3d 909, 915 (Ky. 2004) (internal quotation marks omitted). "The test is not whether we as an appellate court would have decided the matter differently, but whether the trial court's rulings were clearly erroneous or constituted an abuse of discretion." *Ball v. Tatum*, 373 S.W.3d 458, 465 (Ky. App. 2012).

Mother's request for a continuance was entirely conclusory and failed to demonstrate how she would be prejudiced if the termination hearing proceeded before her criminal trial. Regarding the pending criminal proceedings, Mother merely stated: "Neither [Mother] nor [Father] have [sic] been convicted of

anything. The trial in this matter has been continued several times through no fault of their own. A decision should not be made until after the trial, which is scheduled for January 3-5, 2023." In contrast, the Cabinet detailed how a continuance would, in its view, prejudice Child. The Cabinet argued that recent revisions to Kentucky's statutes were aimed at minimizing "foster care drift," and that prolonging stays in foster care undermine that goal. *See Cabinet for Families and Children v. G.C.W.*, 139 S.W.3d 172, 177 (Ky. App. 2004). Additionally, the Cabinet pointed out that even if Mother were acquitted in the criminal trial, that acquittal would not be admissible in the termination proceedings.

After a thorough review of the record, we conclude that the family court did not abuse its discretion. Mother did not demonstrate how she would be prejudiced in the absence of a continuance. Conversely, the Cabinet effectively showed that granting the continuance would harm Child, and this harm was not justified since an acquittal in the criminal case would not be admissible in the termination case. The facts presented by Mother did not necessitate a stay. Therefore, the denial of the continuance fell within the range of permissible decisions based on a correct application of the facts and the law.

## B. Ms. Graves's Testimony

During the final termination hearing, Mother raised two hearsay objections to Ms. Graves's testimony. First, she objected to Ms. Graves's being

allowed to read portions of Ms. Steele's investigative report into the record.

Second, she objected to Ms. Graves's reading a portion of the DNA petition that referenced statements made by Child's deceased maternal grandmother to the Cabinet. The family court overruled both objections.

"Absent abuse, the evidentiary rulings of the trial court are binding upon appellate courts." *Savage v. Co-Part of, Inc.*, 671 S.W.3d 48, 61 (Ky. 2023). Furthermore, not all erroneous evidentiary rulings require appellate courts to reverse or vacate the underlying judgment. "A non-constitutional evidentiary error may be deemed harmless, the United States Supreme Court has explained, if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." [12] *Winstead v. Commonwealth*, 283 S.W.3d 678, 688-89 (Ky. 2009) (citing *Kotteakos v. United States*, 328 U.S. 750, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946)).

"A fundamental rule in the law of evidence is that hearsay evidence is inadmissible evidence" unless such evidence falls within a recognized exception. *Walker v. Commonwealth*, 288 S.W.3d 729, 739 (Ky. 2009). "Hearsay is defined as an out-of-court statement 'offered in evidence to prove the truth of the matter

---

[12] Mother does not explicitly claim any type of constitutional error with respect to the family court's evidentiary rulings; rather, she simply contends that the family court abused its discretion in admitting the evidence. Furthermore, the Sixth Amendment Confrontation Clause does not apply in civil cases. *Cabinet for Health and Family Services v. A.G.G.*, 190 S.W.3d 338, 345 (Ky. 2006).

asserted.'" *Martin v. Commonwealth*, 686 S.W.3d 77, 88 (Ky. 2023) (quoting KRE[13] 801(c)).

We will first address Mother's objection regarding Ms. Steele's investigative report. Mother claims that because the Cabinet is a party to the termination proceeding, it was prohibited from relying on the public records exception under KRE 803(8). Under KRE 803(8) public records and reports are not excluded by the hearsay rules even though the declarant is unavailable "[u]nless the sources of information or other circumstances indicate lack of trustworthiness." However, KRE 803(8) expressly excludes certain records from falling within the public records exception, including "[i]nvestigative reports prepared by or for a government, a public office, or an agency when offered by it in a case in which it is a party." KRE 803(8)(B). Thus, the public records exception only permits the introduction of investigative reports prepared by a governmental agency, like the Cabinet, if agency is not a party or if the report is offered by another presumably adverse party. Because the Cabinet was a party to the termination proceeding and offered the report, it could not rely on the public records exception to the hearsay rules.

It did not, in fact, do so. The Cabinet responded to Mother's objection by asserting that Ms. Steele's report was admissible as a business record pursuant

---

[13] Kentucky Rules of Evidence.

to KRE 803(6).  And the family court allowed Ms. Graves to read *portions* of the report into the record pursuant to the business records exception.  Importantly, however, the family court did not allow Ms. Graves to read the entire report into the record.  The portion read into the record concerned primarily the facts as they were reported to Ms. Steele and a description of Ms. Steele's personal observations of Child's facial injuries on the evening Child was taken to the hospital.  Moreover, Ms. Graves testified that as Ms. Steele's supervisor, she was familiar with the report and that Ms. Steele had prepared it in the regular course of her duties as a Cabinet employee.

"[A]n investigative report of a government agency which is inadmissible under KRE 803(8)(A), (B) or (C) can be admitted under the business records exception, KRE 803(6), if it satisfies the latter rule's more stringent foundation requirements."  *Kirk v. Commonwealth*, 6 S.W.3d 823, 828 (Ky. 1999) (citing *Prater v. Cabinet for Human Resources*, 954 S.W.2d 954 (Ky. 1997)).

Ms. Steele's report was admissible under KRE 803(6) because (1) it was the Cabinet's regular practice to cause such reports to be produced; (2) the report was made at or near the time of the DNA proceeding; (3) by Ms. Steele, a person with knowledge of the facts; and (4) it was kept as a record in the course of the regular conduct of the Cabinet's business.  This does not mean, however, that

the report was subject to admission *carte blanche*. As the Supreme Court of

Kentucky explained in *Prater*, also a termination of parental rights case,

> [T]he factual observations of social workers recorded in
> CHR case records are admissible under the business
> records exception, because such observations would be
> admissible if the social worker testified in person; but the
> recorded opinions and conclusions of social workers are
> not admissible, because the persons offering those
> opinions are insufficiently qualified to render expert
> opinions.

*Prater*, 954 S.W.2d at 958.

The portions of Ms. Steele's investigative record that Ms. Graves read

into the record concerned her personal observations of Child's injuries when she

saw Child at the hospital. The family court specifically instructed Ms. Graves not

to read portions of the report that dealt with statements made by Child's doctors or

any opinions by Ms. Graves concerning how Child came to be injured. Since the

statements at issue were part of a business record and concerned factual

observations, not opinions, the family court properly allowed them under KRE

803(6).[14]

Lastly, Mother complains that Ms. Graves was permitted to read from

the DNA petition, which included statements Child's deceased, maternal

---

[14] Furthermore, Ms. Graves testified to seeing the injuries herself when she transported Child to the hospital, and the family court's written findings cite only to Ms. Graves's description of the injuries. *Prater*, 954 S.W.2d at 959 ("Admission of incompetent evidence in a bench trial can be viewed as harmless error, but only if the trial judge did not base his decision on that evidence, or if there was other competent evidence to prove the matter in issue.") (internal citations omitted).

grandmother made to the Cabinet. These statements were not hearsay because they were not offered to prove the truth of the matter asserted; rather, they were offered to document the information that had been communicated to the Cabinet and to explain why the Cabinet decided to file a DNA action in the first place. "[W]hen the reason that a witness has taken certain actions is an issue in the case, an out-of-court statement that tends to explain that action would not be hearsay because it is not offered 'to prove the truth of the matter asserted.' Rather, it is offered to explain the action that was taken and has relevance regardless of whether the statement was true or false." *Ruiz v. Commonwealth*, 471 S.W.3d 675, 682 (Ky. 2015) (citation omitted); *see also Chestnut v. Commonwealth*, 250 S.W.3d 288, 294 (Ky. 2008).

In any event, the family court's findings and conclusions were not based on any of the grandmother's allegations of abuse. The family court based its findings primarily on Mother's failure to complete her case plan so that she could be reunited with Child. Ms. Youngblood testified about Mother's failure to complete anger management classes, engage in counseling, satisfy her child support obligation, and remain drug free. Ms. Nelson testified that Mother had not visited with Child since July. Their testimony, coupled with the prior finding of abuse and neglect in the DNA action, provided the family court with a sufficient factual basis on which to terminate Mother's parental rights. KRS 625.090.

### III. CONCLUSION

For the foregoing reasons, we affirm the order of the McCracken

Circuit Court terminating Mother's parental rights to Child.

ALL CONCUR.

| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEE CABINET FOR HEALTH AND FAMILY SERVICES: |
|---|---|
| S. Scott Marcum<br>Paducah, Kentucky | Dilissa G. Milburn<br>Mayfield, Kentucky |